BC
FILED
4/23/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
BI

RECEIVED
EE
4/21/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**SZYMON ZAWADZKI,**
Plaintiff,
v.
SWEEPSTEAKS LIMITED d/b/a STAKE.US and MEDIUM RARE N.V. d/b/a STAKE.COM,
Defendants.

Case No. _____
Hon. _____
Mag. _____

1:26-cv-04478
Judge Franklin U. Valderrama
Magistrate Judge M. David Weisman
RANDOM / Cat. 4

**VERIFIED COMPLAINT AND PETITION FOR DECLARATORY
AND INJUNCTIVE RELIEF, ACCOUNTING, AND DAMAGES
DEMAND FOR JURY TRIAL**

Plaintiff Szymon Zawadzki, appearing pro se, alleges as follows:

**I. Nature of the Action**

1. This case presents a threshold forum-control and arbitrability dispute. Plaintiff seeks a judicial determination that he did not knowingly or validly authorize the September 13, 2024 communication that purported to reopen a previously closed AAA/ADR arbitration and thereby surrender the court-forum option that AAA/ADR itself identified on August 27, 2024.

2. This is not a routine complaint about an unfavorable arbitral ruling. The record instead reflects a layered sequence of closure, claimed need for direct claimant confirmation to reopen, reopening in Plaintiff's name the very next day, later representations that Plaintiff had consented to continue off-administration discussions, an abeyance entered on the theory that certain letters had gone unanswered, and later renewed administration after Plaintiff—by then pro se—tried to prevent his claim from dying.

3. Plaintiff also alleges that the reopened arbitration was later used as a platform for selective accounting, selective omission of linked-account activity, contradictory administrative

explanations, and targeted pressure against a known gambling addict whose addiction, insolvency, and vulnerability had already been disclosed to Stake-side personnel.

4. AAA/ADR closed the case on August 27, 2024 after the business failed to provide required waiver and fee materials. The closure letter stated that either party could submit the dispute to the appropriate court.

5. On September 12, 2024, AAA/ADR then stated that the matter would remain closed unless Plaintiff himself confirmed that he wished to reopen it. Plaintiff alleges he never gave informed, express authorization for former counsel to tell AAA/ADR the next day that he wanted to reopen and proceed in arbitration.

6. Plaintiff further alleges he was never told the case was later placed in administrative abeyance, never consented to abeyance, and first learned of that status only because he independently contacted AAA/ADR on February 4, 2025 due to increasing concern about former counsel's lack of communication and ethics.

7. Plaintiff did not discover the full significance of the closure, reopening, and abeyance sequence until after he obtained direct access to the WebFile portal in June 2025 and later compared the portal materials with AAA/ADR letters, former-counsel emails, defense submissions, and his own source files. By then, the reopened arbitration had already been allowed to continue.

8. Plaintiff therefore asks this Court to decide the threshold forum issue, preserve the status quo while that issue is decided, order preservation and limited expedited discovery directed to the closure/reopening/abeyance sequence and the challenged accounting, and adjudicate the underlying Illinois claims if the Court determines that Defendant cannot continue to force Plaintiff through the reopened arbitration.

9. This pleading remains intentionally narrower than Plaintiff's broader notes and sanctions drafts. In this emergency federal filing, Plaintiff does not seek damages from AAA/ADR, the arbitrator, or former counsel. Plaintiff instead seeks threshold relief against the party continuing to press the arbitration, while preserving the larger coordinated-conduct record and any additional claims for later proceedings if necessary.

10. Plaintiff does allege, however, that the current record supports a reasonable inference of coordinated pressure, selective omission, inducement, and economic retaliation among Defendant-side personnel, counsel, affiliate-side actors, VIP-side actors, and related internal systems. Plaintiff further alleges that the serial continuations, off-administration discussions, undisclosed abeyance, later reaffirmed hearing track, and selective production posture functioned as a stalling mechanism that prolonged his exposure to addiction-targeted inducement and economic leverage while source records remained under one-sided control.

## II. Jurisdiction and Venue

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2). Plaintiff is a citizen of Illinois. Upon information and belief, Defendant Sweepsteaks Limited d/b/a Stake.us is organized and operates from Cyprus, and Defendant Medium Rare N.V. d/b/a Stake.com is organized and operates from Curaçao. The amount in controversy exceeds $75,000 exclusive of interest and costs.

12. Independent federal jurisdiction exists here apart from the Federal Arbitration Act because Plaintiff seeks declaratory, injunctive, and damages relief in a civil action that independently satisfies 28 U.S.C. § 1332.

13. Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiff resides in this District, Defendants directed Stake.us and Stake.com conduct into Illinois, Plaintiff's gambling

activity and losses were suffered in Illinois, and the challenged arbitration and related inducement activity were used against an Illinois resident concerning Illinois-centered injuries.

14. This Court has personal jurisdiction over Defendants because each purposefully availed itself of doing business in Illinois by offering or directing Stake.us and Stake.com services to Illinois residents, processing their transactions, marketing into Illinois, communicating with Illinois users, maintaining KYC, VIP, reload, or promotional systems affecting Illinois users, and asserting or materially benefiting from the disputed conduct challenged in this action.

### III. Parties

15. Plaintiff Szymon Zawadzki is an Illinois resident. He has also been known online as "The Dent" and "SimonZ."

15A. Plaintiff's public-facing identifiers include Twitch.tv/the_dent, his primary streaming platform, and X.com/simonzawa. Plaintiff alleges these identifiers matter because compromise of his email, browser data, session cookies, or multi-factor-authentication material would expose not only a private device, but also public-facing streaming, social-media, affiliate, and financially connected accounts.

16. Defendant Sweepsteaks Limited d/b/a Stake.us ("Sweepsteaks" or "Stake.us") owns, operates, controls, markets, or materially benefits from the Stake.us platform, including the dual-currency system, VIP-host system, affiliate system, and the arbitration position challenged in this action.

16A. Defendant Medium Rare N.V. d/b/a Stake.com ("Medium Rare" or "Stake.com") owns, operates, controls, markets, or materially benefits from the Stake.com platform, including its VIP-host, marketing-email, KYC, reload, direct reactivation, and promotional systems.

16B. Plaintiff does not allege that every act of one operator automatically binds the other. He alleges that the current record supports, at minimum, parallel or coordinated use of linked-

account, VIP, inducement, marketing, and payment-related systems that justify naming both entities for preservation, targeted discovery, and non-interference relief.

### IV. Factual Allegations

17. Plaintiff was recruited and compensated to promote or stream Stake-related gambling content through affiliate-side and VIP-side personnel, including Wasim Kahn. The sponsorship communications describe daily or per-stream reloads or fills of Stake Cash and paired Gold Coins, linked to streaming obligations, with redemption mechanics and playthrough requirements.

18. Stake-side communications distinguished between Stake.com fills and Stake.us reloads, but in both forms the platform used SC/GC credits as the mechanism of consideration, inducement, and monetizable value tied to Plaintiff's sponsored streams. Plaintiff alleges this conduct contradicts later litigation positions that SC/GC carried no real value.

19. By December 23, 2023, Plaintiff had directly disclosed to Wasim Kahn that he had hit rock bottom, was dealing with a severe gambling addiction, had been gambling across multiple Stake-related accounts including friends' accounts under his code, and had lost more than $200,000 in roughly two months while asking for help and guidance.

20. Stake indisputably received actual notice of Plaintiff's addiction and deteriorating condition. Wasim Kahn responded that he had read Plaintiff's message, and on January 18, 2024, Stake.us suspended Plaintiff's account based on those addiction-related statements.

21. The Wasim Kahn communications also reflect that account-switching, referral-code changes, multi-account questions, and KYC-related second-account constraints were being discussed in the affiliate channel as early as August 2022. Plaintiff alleges those communications undercut any later effort to portray multiple-account issues as newly discovered or one-sidedly attributable to Plaintiff while omitting Defendant's own knowledge and facilitation channels.

21A. Plaintiff also preserves May 2024 Telegram messages in which, after Richie sent Plaintiff for a .com account under code UFOS, a user identified as Sonyvaio told Plaintiff to provide desired usernames, later delivered the DentedOne account credentials and associated Gmail credentials, and instructed Plaintiff to secure the Gmail account, change the Stake.com password, and add 2FA. Plaintiff alleges those messages are significant because they suggest acting-in-concert affiliate-side or VIP-side actors were facilitating alternate or linked-account creation rather than merely discovering such accounts later.

21B. In the same account-creation window, Plaintiff asked whether the new DentedOne account could receive a 200% deposit-wager bonus associated with the UFOS code. Plaintiff later preserved materials he understood as showing that the bonus was not honored because the initial deposit had been flagged as suspicious. Plaintiff alleges, on information and belief, that the initial deposit came from his main Bybit-funded wallet and that the sequence supports an inference that operator-side or affiliate-side systems could identify account linkage from the outset.

21C. Plaintiff also preserves Discord and community screenshots in which Richie was identified as an affiliate manager, publicly offered help creating Stake.com or Stake.us accounts, and directed users to open tickets if they needed help making accounts. Plaintiff alleges those materials further undercut any attempt to portray linked-account knowledge as wholly one-sided or newly discovered.

22. Before arbitration was filed, Plaintiff tried to resolve the matter informally. On April 14, 2024, Plaintiff asked Wasim Kahn whether Stake could offer any relief or loss-back or whether arbitration was the only option for relief. Wasim Kahn said he could not assist and directed Plaintiff to Stake support.

23. Plaintiff's then-counsel thereafter sent written pre-arbitration notice to Stake support on May 30, 2024. Stake requested fourteen business days to investigate on June 7, 2024, and on June 23, 2024, Stake denied liability and asserted that the claim lacked merit.

24. Those communications materially undercut Defendant's later position that Plaintiff bypassed or failed the informal-resolution process. Indeed, on August 30, 2024, Defendant's counsel argued to AAA/ADR that arbitration should not proceed because Plaintiff had not complied with the informal-resolution requirement, but on September 2, 2024, Plaintiff's then-counsel

responded that this assertion was demonstrably incorrect and specifically cited the May 30 notice and June 23 response. On September 9, 2024, counsel further asked AAA/ADR whether the matter would reopen or whether the parties should instead proceed in court.

25. On August 27, 2024, AAA/ADR declined to administer the arbitration because the business failed to provide required waiver and fee materials, closed the file, and stated that either party could submit the dispute to the appropriate court.

26. On September 12, 2024, AAA/ADR stated that the case remained closed and would stay closed unless Plaintiff directly confirmed that he wished to reopen it.

27. On September 13, 2024, former counsel nevertheless sent AAA/ADR a communication stating, in substance, that Claimant would like to reopen the case and proceed with the arbitration. Plaintiff alleges that he did not knowingly authorize that representation, did not knowingly waive the court-forum option created by the August 27 closure, and was not contemporaneously informed that former counsel had made that representation in his name.

28. On September 16, 2024, AAA/ADR acknowledged that confirmation and treated the matter as reopened. On September 20, 2024, AAA/ADR allowed the matter to proceed only after identifying substantial or material due-process deviations in Defendant's arbitration clause and requiring waiver of those deviations.

29. The representation problem is reinforced by later former-counsel admissions. In a May 8, 2025 email thread, former counsel stated that they had assumed Plaintiff had signed a retainer through referring counsel, later confirmed that was not the case, and said their representation of Plaintiff had not been pursuant to a retainer agreement. Related communications separately described the absence of a formal retainer as an oversight.

30. The same former-counsel materials also reflect inconsistent or incomplete descriptions of settlement posture. Former counsel later clarified that a previously referenced $50,000 figure had not been a formal offer, but only an informal discussion point, while other communications had described that number much more definitively. Plaintiff also alleges he was not timely told about the November 21, 2024 settlement offer or later abeyance-trigger letters.

31. The abeyance sequence created a second disputed-consent problem. On November 22, 2024, defense counsel told AAA/ADR that the parties were engaged in discussions and that both sides had consented to continue independent discussions for two more weeks. Plaintiff alleges he did not knowingly authorize any representation to AAA/ADR that he had consented to hold off administration on that basis.

32. On December 30, 2024, AAA/ADR warned counsel that the matter would be placed in abeyance without a ready-to-proceed response by January 13, 2025. On January 15, 2025, AAA/ADR placed the matter in administrative abeyance because no response had been received to letters dated November 8, December 9, and December 20, 2024. Plaintiff alleges he was never told the case had been put into abeyance, never consented to abeyance, and did not even know what abeyance meant when it was later referenced.

33. Plaintiff first learned the case had been placed in abeyance only because, on February 4, 2025, he personally contacted AAA/ADR to ask what was happening in his own case. AAA/ADR's February 4 letter confirms that Plaintiff himself called seeking a status update.

34. On that same date, February 4, 2025, Edwin Kilpela wrote that contacting AAA/ADR outside counsel's presence was not helpful to Plaintiff's claim and instructed Plaintiff not to contact AAA/ADR directly again. Plaintiff contemporaneously documented that former counsel had

discussed possible mid-case withdrawal and pressured settlement while also telling him the case was unlikely to succeed in arbitration.

35. On February 26, 2025, David Slade sent Plaintiff a memorandum intended to help him proceed on his own and said that, if it looked acceptable, counsel would formalize withdrawal and notify AAA/ADR. On March 21, 2025, former counsel withdrew, leaving Plaintiff pro se after the case had already passed through closure, disputed reopening, due-process waiver issues, and undisclosed abeyance.

36. After withdrawal, Plaintiff tried to keep his claim from dying. In May 2025 communications to AAA/ADR and defense counsel, Plaintiff stated that he had never received notice of the settlement-offer history, had never consented to abeyance, and had first learned of the status only after contacting AAA/ADR himself. AAA/ADR nevertheless treated those communications as a ready-to-proceed confirmation and, on May 13, 2025, administratively appointed an arbitrator.

36A. Plaintiff further alleges that the reopening, off-administration discussions, undisclosed abeyance, later continuations, and repeated segmentation of the record functioned in practice as a stalling posture. In Plaintiff's view, that stalling posture kept his claims unresolved while bonus, reload, affiliate, linked-account, and VIP-side channels remained available as leverage against a person whose severe gambling addiction had already been disclosed.

37. Plaintiff alleges that his post-withdrawal effort to prevent the claim from dying did not retroactively ratify the separate August 27, 2024 closure, the September 13, 2024 reopening done in his name, or the later November 2024-January 2025 abeyance sequence.

38. Plaintiff did not directly access the AAA/ADR WebFile portal until June 6, 2025, when he used ADR's username-recovery process and then began reviewing the file himself. Plaintiff alleges he did not know the case had been closed and reopened until that June 2025 access, and that he did not understand the significance of the sequence until later research prompted by repeated evasive or nonresponsive answers.

39. The WebFile portal later displayed to Plaintiff, among other things, a documents-tab entry showing the August 27, 2024 closure row itself; a September 2024 document sequence showing the September 12 request for claimant confirmation, the September 13 reopening communication, and the September 16 acknowledgment; a case-participants page displaying a $0.00 claim amount; a case-information page showing the claim amount as Undetermined while listing the panelist's phone and email fields as N/A; a claim-document page listing selected filings; and an offer-history page stating No data to display. Plaintiff uses those portal screenshots as evidence of what the system displayed to him after he became pro se, not as stand-alone proof of what may or may not have occurred outside the portal.

40. The portal-state materials also revealed record-integrity concerns. The abeyance start date appeared as January 14 in one AAA/ADR letter and January 15 in another. The claim amount appeared both as $0.00 and as Undetermined in different portal views. The offer-history page was blank. And on December 18, 2025, AAA/ADR confirmed in writing that some materials could not be uploaded to WebFile and had instead been forwarded directly to the arbitrator.

41. Plaintiff further alleges that, during November 2025 file-submission disputes, AAA personnel first stated that certain file types such as zip or html could not be uploaded, then cited size-related limitations, and later wrote that documents could ordinarily be uploaded on a party's behalf but that an unspecified error was being encountered. Plaintiff asked for a concrete error log and says no such log was produced. Plaintiff alleges that the sequence matters because it bears on record completeness, audit trails, and whether relevant materials were being accepted, rejected, or routed inconsistently.

42. Plaintiff has now obtained direct crypto-casino account-history files for DentedOne, TheBossManJack, Stake.com SimonZ, Stake.us SimonZ, and sylmark. Using stablecoin-only

entries as a conservative floor, the accessible ledgers show approximately $261,915.34 in claimant-funded losses across DentedOne ($150,477.48), sylmark ($28,911.83), TheBossManJack ($13,694.70), and Stake.com SimonZ ($68,831.33), before the adjusted Stake.us SimonZ reconciliation and before the presently inaccessible account are added.

42A. One presently inaccessible account is still estimated at approximately $125,000 in additional losses. On Plaintiff's current conservative working view, that raises the non-Stake.us-SimonZ floor to approximately $386,915.34.

43. Plaintiff also has generated summaries showing repeated reuse of overlapping withdrawal destinations across separately named accounts, including shared XRP, TRON-style, EVM-compatible, Solana-style or base58, and Litecoin payout endpoints. Plaintiff alleges those overlaps strongly support the inference that Defendants could link the accounts through ordinary platform-side records, fraud controls, payments data, marketing eligibility rules, or compliance systems even while advancing selective account-based narratives in arbitration.

44. Plaintiff further alleges that Defendants' present net-winner narrative is materially misleading because it fails to cleanly separate player-funded purchases from site-issued commission and reload credits. Plaintiff's current working reconciliation for the Stake.us SimonZ account reflects at least 92,249.98 SC in platform-recorded commission, at least 225,000.00 SC in counted reload credits, and at least 317,249.98 SC in total identified site-issued value. On Plaintiff's present count-based reconstruction, the Stake.us SimonZ account supports an adjusted claimant-funded loss floor of approximately $310,723.74.

44A. When the raw Stake.com SimonZ stablecoin floor of approximately $68,831.33 is added to that adjusted Stake.us SimonZ reconstruction, Plaintiff's present working combined floor across the reconciled accounts rises to approximately $697,598.05, subject to full source-record production and later refinement.

45. Plaintiff alleges that the above accounting issues matter not only to damages, but also to the threshold equities of interim relief, because Defendant has used exact internal figures offensively while resisting production of the transaction-level and category-by-category records needed to test those figures honestly.

45A. The current accessible transaction histories also reveal timing correlations Plaintiff alleges are material. Stablecoin funding activity across the accessible accounts surged to roughly $2.03 million in September 2024 in the same general window in which Jovan became Plaintiff's VIP host, credited level-up and gameplay bonuses, refreshed reloads, and enabled a 10% cashback or lossback structure.

45B. By contrast, stablecoin inflows across the accessible accounts fell dramatically across January through May 2025 to roughly $21,903.50 total. Plaintiff alleges that steep decline is consistent with a period of attempted abstinence or material reduction, and that the June 2025 Dunja host-transition bonus and reload outreach and the direct Stake.com comeback and reload emails in February and March 2026 were aimed at a materially slowed or dormant gambling period.

46. Plaintiff further alleges that, after a November 19, 2025 post-hearing call that had been presented during the hearing as a witness-list call but instead focused on settlement pressure, a Stake VIP host sent a reload-session message the very next day to an account Plaintiff says had been inactive and unused for more than five months. Plaintiff alleges that the account receiving that reload message was a makeshift or alternate account whose status and KYC treatment had already been a concern, and that the timing made the outreach non-routine in Plaintiff's understanding of Stake's reload and VIP practices.

47. Plaintiff alleges that immediately after he resisted settlement pressure and insisted on accountability, Defendant also shut off or interfered with historical affiliate funds that had previously trickled in to support his survival. Plaintiff alleges those funds were important to his day-to-day subsistence, that Defendant knew he was financially vulnerable because of his gambling addiction, and that the sequence of settlement pressure, next-day reload outreach, and

affiliate-fund interruption supports a reasonable inference of targeted inducement, coordinated pressure, and economic retaliation.

48. Plaintiff further alleges that the stress, isolation, and financial disruption tied to the above sequence contributed to relapse and worsening harm. Plaintiff does not plead that allegation to seek sympathy. He pleads it because it bears directly on irreparable harm, causation, damages,

48A. Plaintiff also preserves a March 3, 2025 Stake.com KYC level 3 email sent to the DentedOne account, a February 16, 2026 noreply@mail.stake.com VIP-return email urging Plaintiff to message a VIP host on Telegram, a March 21, 2026 email from Andy Stake <andy@stake.com> introducing himself as Plaintiff's new VIP host and stating that he had taken over Dunja's players, a March 25, 2026 noreply@mail.stake.com email offering a $20 bonus and $50,000 promotion, and a March 28, 2026 email from Andy Stake <andy@stake.com> stating that a new boosted reload session had been set if Plaintiff decided to come back. Plaintiff alleges those direct operator-branded communications materially tie Medium Rare N.V. d/b/a Stake.com to the inducement, KYC, reactivation, and linked-account aspects of this case.

49. Plaintiff also preserves broader digital-evidence and cyber-preservation concerns. In January 2026, Stake promotional emails to an account Plaintiff identifies as linked or dormant included VIP-ladder, monthly, and bonus messaging despite Plaintiff's claimed period of abstinence or severe reduction in gambling activity and despite the prior linked-account and KYC anomalies he had already documented.

49A. Plaintiff later preserved and reported to IC3 that a January 16, 2026 VIP-bonus email appearing from noreply@mail.stake.com was associated with a malicious HTML payload or attachment identified by SHA-256 a15b6042f82313b2cbbcfd4e64dfb09ef777ab9e31948bb993b75eb3ccd50584. Plaintiff does not ask this Court to treat that preserved material, standing alone, as conclusive proof of final attribution or every technical consequence he fears. He pleads it because it materially elevates

the seriousness of the preservation request and supports a reasonable inference of deliberate malicious design rather than ordinary spam.

49B. Plaintiff also preserved a structured SHA-256 analysis of the HTML file associated with that promotional flow. According to that preserved report, the file was a 12.21 KB HTML document employing HTML smuggling and was described as interacting with browser-storage, DPAPI-related decryption functions, the Authenticator browser extension, SecurityHealthService-related COM registry paths, BrowserMetrics / SetupMetrics artifacts, and Microsoft-looking telemetry indicators. Plaintiff pleads that report to show urgency, magnitude, and the need to preserve the underlying email, attachment, header, redirect, vendor, linked-account, and account-security records, not to overstate final forensic attribution on the present record.

49C. Plaintiff further preserved screenshots from April 2026 reflecting Windows Security device-security irregularities and a Google device-activity error encountered while reviewing account or device history. Plaintiff does not plead those screenshots as conclusive forensic proof. He pleads them as corroborative background consistent with ongoing device or account-integrity concerns and as further support for immediate preservation.

49D. Plaintiff further alleges that the January 2026 promotional flow was directed at a person whose public-facing identity, including Twitch.tv/the_dent and X.com/simonzawa, was already connected to Stake-related streaming and affiliate activity, thereby increasing the foreseeable magnitude of any theft of browser data, session cookies, or two-factor-authentication material across personal, business, social-media, and financial accounts.

50. On February 4, 2026, the Illinois Gaming Board sent Stake a cease-and-desist letter stating that it had reason to believe Stake.us was engaged in the operation of an illegal online casino in

Illinois, that Illinois users were being offered slots, table games, and sports wagering with the opportunity to win cash and cryptocurrency, and that Stake must block Illinois residents or discontinue offering cash and cryptocurrency.

50A. On March 17, 2026, Defendant filed a response to Plaintiff's emergency arbitration motion that made several points Plaintiff alleges are significant admissions for present federal purposes. Defendant stated it had no objection to the record reflecting that Plaintiff believes the dispute amount is greater than $0.00; repeated AAA's position that the $0.00 figure was only a placeholder because the original Demand did not specify a number; and stated it had no objection to a temporary administrative stay or extension while recusal issues were pending.

50B. In that same March 17, 2026 filing, Defendant also stated that it ceased making payments to Plaintiff because Plaintiff was suing Defendant and characterized that as a natural and predictable response. Plaintiff alleges that admission materially strengthens his claim that the affiliate-funds cutoff was retaliatory, coercive, and directly tied to his pursuit of accountability rather than to any neutral business reason.

50C. Defendant's March 17, 2026 filing also opposed source-record production, linked-account production, and preservation relief as untimely or unnecessary while simultaneously insisting that Defendant's own exact internal spent, redeemed, and pocketed figures and selected WebFile exhibits were sufficient. Plaintiff alleges that posture exemplifies the same selective-disclosure problem that makes interim preservation and targeted expedited discovery necessary.

50D. On March 27, 2026, AAA leadership separately advised Plaintiff that the arbitrator challenge had been resolved, that the arbitrator had been reaffirmed, that the hearing was then scheduled for April 22, 2026, and that the primary remaining administrative item was the claim amount reflected in WebFile. Plaintiff alleges that communication confirms the continuing

unresolved nature of the $0.00 placeholder issue and further reflects AAA's effort to segment or sanitize the record by asking that materials for the arbitrator exclude challenge-related references rather than preserving the full history as one coherent record.

50E. On March 27, 2026, Plaintiff also filed an FBI Internet Crime Complaint Center ("IC3") complaint, Submission ID fe6154d7906c45baacee75cf0a4e11e5, reporting suspected cyber-interference tied to the January and March 2026 Stake / SendGrid promotional-email flows, the preserved a15b6042f82313b2cbbcfd4e64dfb09ef777ab9e31948bb993b75eb3ccd50584 body-hash continuity, and related device-integrity concerns. Plaintiff alleges that same-day federal cyber escalation is relevant because it shows the seriousness with which he contemporaneously viewed the threat while the arbitral track remained active.

50F. Plaintiff further alleges that the same-day combination of AAA's March 27, 2026 reaffirmation of the arbitrator and Plaintiff's federal law-enforcement escalation through IC3 materially heightens the urgency of immediate preservation and status-quo relief. In Plaintiff's view, that sequence shows that the arbitration was continuing to move toward hearing while the challenged placeholder, segmentation, inducement, and digital-preservation issues remained unresolved.

50G. On May 16, 2025, defense counsel George Calhoun wrote that Defendant was willing to offer $45,000 plus enrollment in a treatment program through Birches Health as full and complete settlement, while also warning that if Stake was required to spend additional funds on the arbitration the number would no longer hold and could decrease after the upcoming payment deadline. Plaintiff alleges that communication itself confirms defense-counsel awareness that addiction treatment and Plaintiff's vulnerability were central to the dispute and were being discussed in direct relation to the cost and timing of the arbitration.

50H. On May 20, 2025, Plaintiff then wrote directly to George Calhoun and Michelle Cohen that he had lived for over two years in isolation, addiction, and shame, had survived two suicide attempts, had repeatedly sought guidance rather than money, and believed that numerous Stake-affiliated streamers and Stake-side personnel had witnessed his pain. Plaintiff alleges that by that

date Defendants' counsel had direct written notice of the magnitude of Plaintiff's addiction-related suffering and fragility.

50I. Plaintiff further alleges that inducement continued after that direct notice. The preserved record includes June 2025 Dunja-host bonus communications, February 1, 2026 Andy-host exchanges in which Plaintiff expressly stated that gambling had become unhealthy and that he needed a break, and later March 2026 VIP-host, bonus, and boosted-reload emails to the DentedOne or linked-account channels. Plaintiff alleges that sequence supports a strong inference that Defendants and those acting in concert with them continued to use bonus, reload, VIP, and reactivation mechanisms against a person whose addiction and distress had already been explicitly disclosed.

50J. Plaintiff further alleges that the January 16, 2026 cyber-lure record is now materially stronger than in earlier versions of this packet. Plaintiff preserves the native source for a January 16, 2026 email sent to a linked ProtonMail account from "Stake.com" <noreply@mail.stake.com>. The preserved headers show SPF, DKIM, and DMARC passing through em.mail.stake.com / mail.stake.com and SendGrid-associated infrastructure, and the preserved raw HTML shows the main tracked bonus button pointing to a playstake.info bonus URL. Plaintiff also preserves VirusTotal URL-details records for that exact tracked URL reflecting status 200, body length 12.21 KB, and Body SHA-256 a15b6042f82313b2cbbcfd4e64dfb09ef777ab9e31948bb993b75eb3ccd50584. Plaintiff alleges that continuity materially strengthens the inference that the authenticated lure email and the preserved HTML sample were part of the same promotional-delivery chain.

50K. Plaintiff further preserves VirusTotal / CAPE behavior materials for the same a15b hash. Those preserved materials reflect process-injection, encrypted-channel behavior, Microsoft-CryptoAPI/10.0 traffic, SNI nexusrules.officeapps.live.com, and file-system or network interaction involving Chrome, DPAPI-related functions, Windows Security Health paths, Bing, Google, Cloudflare, and Azure-associated infrastructure. Plaintiff pleads those materials as preservation-triggering and discovery-triggering evidence of serious computer tampering, not as final merits proof of every technical consequence.

50L. Plaintiff also preserves the authenticated March 25, 2026 DentedOne email sent to dentedone3@gmail.com from "Stake.com" <noreply@mail.stake.com> through mail.stake.com / SendGrid, with subject "DentedOne, your $20 bonus + $50,000 shot." The preserved raw source contains the exact SendGrid-tracked main bonus URL and the visible bonus destination playstake.info/bonus?code=ALLIPLAT4MOLES260325. Plaintiff alleges that March 25 record shows a second authenticated operator-controlled inducement flow to the DentedOne account during the same broader compromise window.

50M. Plaintiff further alleges that the cyber event was not abstract. On February 15, 2026, PayPal sent an authenticated notice stating that account features had been paused because it

appeared someone was trying to use Plaintiff's PayPal account without permission. On February 17, 2026, PayPal separately stated it was reviewing unauthorized transactions and later determined that the payments in question were unauthorized and refunded the full amounts. On February 27, 2026, BingX sent an authenticated account-features-restricted notice stating that it had flagged a possible security breach. On March 21, 2026, Bank of America sent an authenticated fraud-claim email confirming a claim request received with a claim amount of $5,100.00. Plaintiff alleges these third-party records show real downstream account compromise, real financial harm, and real response activity during the same overall period.

50N. Plaintiff also preserves device-side and Windows-security evidence consistent with serious tampering concerns. The preserved Defender and DefenderUI materials reflect repeated real-time-protection failures, exploit-guard Event 1121 blocks involving svchost.exe / lsass.exe, disabled or unavailable protection updates, behavior-monitoring failures, controlled-folder-access events affecting Plaintiff's legal-filing directories, and security-intelligence irregularities. Plaintiff pleads those materials as corroborative evidence of system-integrity disruption and as further reason for immediate preservation and targeted discovery.

50O. Plaintiff alleges that the above combination of actual notice, prolonged arbitration pressure, authenticated inducement flows, downstream financial-account compromise, and device-side tampering indicators left him in a fragile and ongoing state of crisis rather than permitting stabilization. Plaintiff pleads that current fragility because it bears directly on irreparable harm, the need for a strong no-inducement / non-interference order, and the need to prevent further use of the challenged arbitration posture as a weapon against his addiction.

51. Plaintiff alleges that continued forced participation in the reopened arbitration will cause irreparable harm by entrenching a forum Plaintiff says he never validly reauthorized, by enabling further use of incomplete or selective records, by leaving targeted inducement and economic-pressure channels available against a known gambling addict, and by allowing a stalling posture to continue while Plaintiff's threshold objections and preservation demands remain unresolved.

### V. Claims for Relief

52. Count I — Declaratory Judgment (28 U.S.C. §§ 2201-2202). An actual controversy exists between Plaintiff and, at minimum, Sweepsteaks concerning whether Plaintiff knowingly and

validly agreed to continue with the reopened arbitration after AAA/ADR had already closed the case and stated that either party could proceed in court. To the extent Medium Rare or any other actor claims benefit from, or acts in concert with, that challenged arbitral posture, the controversy also extends to them.

53. Count II — Injunctive Relief / Preservation of the Status Quo. Plaintiff seeks preliminary and permanent injunctive relief barring Defendants and those acting in concert with them from taking further substantive steps to prosecute or obtain merits rulings in AAA/ADR Case No. 01-24-0006-1550 until this Court resolves Count I, together with preservation, non-inducement, non-retaliation, and targeted expedited-discovery relief.

54. Count III — Illinois Gambling Loss Recovery Act, 720 ILCS 5/28-8. Plaintiff alleges that the Stake.us and Stake.com operations, as applied to Illinois users and to Plaintiff's accounts and transactions, involved illegal gambling for money or other things of value and that Plaintiff lost sums far exceeding $75,000 through those operations. Plaintiff seeks recovery to the fullest extent permitted by applicable law and subject to later source-ledger clarification.

55. Count IV — Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2. Plaintiff alleges that Defendants marketed and operated Stake.us and Stake.com in a deceptive and unfair manner by presenting value-bearing gambling systems as lawful or no-value models, by using SC/GC reloads, commissions, bonuses, or VIP benefits as inducement and leverage, by selectively omitting linked-account and site-issued value from later accounting narratives, and by continuing inducement after actual notice of Plaintiff's severe gambling addiction.

56. Count V — Accounting. Plaintiff seeks a full accounting from Defendants of all linked or linkable accounts, purchases, credits, reloads, commissions, wagers, redemptions, withdrawals,

wallet linkages, KYC and compliance flags, affiliate records, VIP communications, marketing logs, and other source materials necessary to determine the real claimant-funded floor and the extent of any selective omission.

56A. Count VI — Illinois Computer Tampering, 720 ILCS 5/17-51(a)(4) and (c). Plaintiff realleges the preceding paragraphs. Plaintiff alleges that Defendants, directly or through persons, systems, or vendors acting in concert with them, knowingly caused or attempted to cause a program or data to be inserted into, communicated to, or transmitted to Plaintiff's computer and related accounts without authorization, at minimum through the January 16, 2026 authenticated Stake / SendGrid / playstake.info body-hash chain and related March 2026 promotional flows. Plaintiff further alleges that the preserved a15b6042f82313b2cbbcfd4e64dfb09ef777ab9e31948bb993b75eb3ccd50584 HTML sample, the preserved behavior records, the downstream account-compromise records, and the device-integrity failures support a claim for civil relief under 720 ILCS 5/17-51(c) for damage, attempted damage, loss, and response expense.

### VI. Prayer for Relief

57. WHEREFORE, Plaintiff respectfully requests that the Court: (a) declare that Plaintiff did not knowingly and validly authorize the September 13, 2024 reopening of the previously closed AAA/ADR matter; (b) temporarily and preliminarily enjoin Defendants and those acting in concert with them from taking further substantive steps in AAA/ADR Case No. 01-24-0006-1550 until this Court resolves the threshold forum dispute; (c) order immediate preservation of source-ledger, linked-account, marketing, SendGrid, Mimecast, playstake.club, KYC, VIP, affiliate, and related records within Defendants' possession, custody, or control; (d) authorize limited expedited discovery narrowly tailored to those threshold, inducement, and preservation issues; (e) prohibit further reload, bonus, reactivation, VIP-ladder, affiliate, or comparable gambling-inducement communications directed to Plaintiff, any linked account associated with Plaintiff, or Plaintiff's public-facing identity while this action is pending; (f) prohibit retaliatory deletion, suspension, reduction, or manipulation of affiliate-payout, linked-account, or bonus records while this action is pending; (g) award statutory, compensatory, accounting, declaratory,

injunctive, and such other relief as the Court deems just and proper; and (h) grant leave to amend as discovery proceeds.

### VII. Jury Demand

58. Plaintiff demands trial by jury on all issues so triable.

### Verification

I, Szymon Zawadzki, declare under penalty of perjury under 28 U.S.C. § 1746 that I have read the foregoing pleading and that the factual allegations contained in it are true and correct to the best of my personal knowledge, information, and belief. Dated: April 17, 2026 /s/ Szymon Zawadzki Szymon Zawadzki